[Civ. No. 43314. Second Dist., Div. Five. Nov. 14, 1974.]

MARION DAVIS, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
ST. JOHN'S HOSPITAL, Real Party in Interest and Respondent.

## COUNSEL

Telanoff, Bobrowsky & Wallin and Ronald M. Telanoff for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, and Edward M. Belasco, Deputy Attorney General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

## OPINION

**ASHBY, J.**—Petitioner appeals from a judgment denying the issuance of a writ of mandate to compel the California Unemployment Insurance Appeals Board (respondent) to set aside its decision denying unemployment insurance benefits to petitioner.

After petitioner was discharged from her employment, the Department of Human Resources Development awarded her unemployment benefits. St. John's Hospital appealed and a hearing was held. The referee at the conclusion of the hearing reversed the department on the basis that petitioner was disqualified for benefits under Unemployment Insurance Code section 1256. Petitioner's writ of mandate was heard in superior court and judgment was entered in favor of respondent.

At the conclusion of trial the court made the following finding of fact: "Petitioner was aware of the medication policies of St. John's Hospital at the time she administered medication to Mrs. Bishop, a female patient at the hospital on October 13, 1973. The medication was ordered by Dr. Jurgutis to be Demerol, 100 mgm., whenever necessary for pain, but petitioner wilfully violated these written orders and administered Demerol 50 mgm., rather than the 100 mgm. prescribed by the attending physician. Petitioner had not telephoned Dr. Jurgutis to ask permission to change Mrs. Bishop's medication and had not consulted the house doctor on duty at the hospital regarding such change."

It is our function as the reviewing court to consider all the evidence in the most favorable aspect toward the prevailing party and give that party every favorable inference that can reasonably be drawn in support of the judgment. (*Hanna* v. *O'Connor*, 106 Cal.App.2d 760, 767 [236 P.2d 181]; *Estate of Poole*, 156 Cal.App.2d 768, 775 [320 P.2d 62]; *People* v. *Mosher*, 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) Taking that view of the evidence the facts are as follows: Petitioner is a registered nurse who was employed as a staff nurse at St. John's Hospital in Sherman Oaks from 1960 until her discharge from employment on October 24, 1972. Petitioner's discharge stemmed from her deliberate violation of hospital policy by changing the prescribed amount of medication she administered to a patient without the permission of a physician.

On the evening in question petitioner was the assigned "medication nurse." In that capacity petitioner had the responsibility of administering medication to patients. Medication at St. John's is dispensed under strict rules of procedure. A written order by a physician is required. The order

prescribes medication to be given, the dosage and the "route of administration."[1] The medication nurse is not authorized to change the medication order or dispense medication in noncompliance with the order. To change a medication order a specific procedure must be followed: The medication nurse must obtain permission from the patient's doctor or his designated standby to make a change. If neither can be contacted, the medication nurse must obtain permission from the hospital's house doctor.[2] A medication nurse has a responsibility to obtain the necessary permission to change the medication order or obtain any needed clarification relating to it. Although the medication nurse can consult with the charge nurse, she cannot shift to her the responsibility of administering medication to the patients. The procedure for changing medication orders is set forth in a procedure book and is imparted to staff personnel as part of their employee orientation. The policy is also contained in a nursing bulletin by which the nursing staff was reminded of the procedure. In addition, the procedure was called to the attention of hospital personnel in a monthly newsletter, a copy of which was posted in each nursing unit.[3]

There is no question that the prescribed medication was for 100 milligrams. Petitioner admits that she administered only 50 milligrams. She further admits that she did not telephone Dr. Jurgutis or any other physician before changing the medication. Petitioner knew that there was a house doctor on duty with whom she could have communicated had she been unable to reach Dr. Jurgutis or his standby.[4]

The question presented by this appeal is whether substantial evidence supports the finding of the trial court that by withholding requested and prescribed medication from a patient petitioner was guilty of misconduct within the meaning of section 1256 of the Unemployment Insurance Code.[5]

---

[1]The route of administration means the time the medication is to be administered and the means to be utilized, oral, intramuscular or intravenous.

[2]A house doctor is on duty at all times.

[3]Petitioner's explanation of why she did not administer the prescribed dosage was that the patient was drowsy early in the evening and she thought it might be detrimental to the patient to give the prescribed dosage. Petitioner went to the in-charge nurse, Cynthia Scott, and was told that she could give the patient 50 milligrams of Demerol instead of the 100. Mrs. Scott testified at the hearing that she agreed with the reduction of the dosage of medication. The regular in-charge nurse testified that it was theoretically wrong to give the half dose but that she probably would have acted as did Davis and Mrs. Scott. Dr. Jurgutis' statement in the Record of Claim Status Interview (Exh. 1, p. 3, Admin. Record) reads: "I have no objection to a nurse deciding that in her judgment a patient should have less medication. Many nurses do this. . . ."

[4]Furthermore, there had been previous complaints from patients against petitioner which we will discuss in detail.

[5]Unless otherwise stated, all citations are to the Unemployment Insurance Code.

## DISCUSSION

Section 1256 provides: "An individual is disqualified for unemployment compensation benefits if the director finds . . . that he has been discharged for misconduct connected with his most recent work." ■ It is well settled that misconduct as used in section 1256 is limited to " 'conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, . . .' " *(Maywood Glass Co.* v. *Stewart,* 170 Cal.App.2d 719, 724 [339 P.2d 947], quoting *Boynton Cab Co.* v. *Neubeck,* 237 Wis. 249 [296 N.W. 636, 640]; *Lacy* v. *California Unemployment Ins. Appeals Bd.,* 17 Cal.App.3d 1128, 1132 [95 Cal.Rptr. 566]; *Jacobs* v. *California Unemployment Ins. Appeals Bd.,* 25 Cal.App.3d 1035, 1037 [102 Cal.Rptr. 364]; *Silva* v. *Nelson,* 31 Cal.App. 3d 136, 140 [106 Cal.Rptr. 908]; *Rowe* v. *Hansen,* 41 Cal.App.3d 512, 520 [116 Cal.Rptr. 16].)

The trial court, exercising its independent judgment of the record of the administrative proceedings, after reviewing that record found that petitioner's discharge was proper under section 1256 and that the decision of the Unemployment Insurance Appeals Board was supported by the evidence. Our function as an appellate court is to determine whether the findings and judgment of the trial court are supported by substantial evidence. *(Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.App.3d 1128, 1134; *Warriner* v. *Unemployment Ins. Appeals Bd.,* 32 Cal.App.3d 353, 358 [108 Cal.Rptr. 153].)

■ The key to the determination as to whether appellant's action amounted to misconduct under section 1256 is whether or not petitioner's discussion of the matter with the charge nurse rather than obtaining the permission of a doctor was a deliberate, intentional and wilful violation of the rule.

The evidence before the court in the instant case was that petitioner had a predisposition to not giving the proper dosages of medication because she did not believe that patients should receive what in her opinion was excessive medication. There was evidence that there had been prior complaints from patients that petitioner did not give them the proper dosage of medication and that petitioner had lectured them concerning taking medication. Petitioner was told of this problem concerning medication and reference to it is contained in her employee performance evaluation report dated June 21, 1972. In that report, which she signed, the supervisor's comments were as follows: "When responsible for dispensing all medications, tensions

mount, minor infractions become major ones with all persons becoming upset and irritable. [¶] Mrs. Davis is primarily concerned, however, with the acutely ill and has little sympathy for chronic drug users. It is in this area where most of the problems arise. She dislikes being a pawn in the continuation of their habit and consequently with-holds requested and ordered medication which is most upsetting to patients. [¶] Recommend giving medications cheerfully and promptly; curtailing comments regarding drug use; . . ." Apparently, in the case in question, she also believed that too much medication had been prescribed for that particular time. The rules requiring consent and permission of a doctor to change the dosage were very clearly set forth. Petitioner had been a registered nurse at St. John's Hospital for approximately 12 years. On the evidence before the trial court, the court could reasonably infer that petitioner knew of the rules for changing prescriptions, did not wish to administer the amount of medication prescribed and deliberately did not consult a doctor, but instead used the in-charge nurse as either a sounding board or as an excuse for not giving the required medication, knowing that it was petitioner's responsibility as medication nurse to make the determination and not the charge nurse. The finding of the court that appellant was discharged for misconduct and not eligible under section 1256 for unemployment compensation is supported by substantial evidence[6] and thus is binding upon this court. (*General Motors Corp.* v. *Cal. Unemployment Ins. Appeals Bd.*, 253 Cal.App.2d 540, 545 [61 Cal.Rptr. 483]; see also *Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.App.3d 1128; *Agnone* v. *Hansen,* 41 Cal.App.3d 524 [116 Cal.Rptr. 122].)

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

---

[6]Had the trial court found for petitioner, that determination also would have been supported by substantial evidence. *Delgado* v. *Unemployment Ins. Appeals Bd.,* 41 Cal.App.3d 788 [116 Cal.Rptr. 497], is the mirror image of the instant case in that there it was held that the evidence was substantial to support the trial court's finding that there was no misconduct by the employee who was a checker employed by Lucky Food Stores. She was discharged for failing to separately record three sales on her cash register. The Court of Appeal, at page 792, held that: "Respondent did knowingly violate a company rule when she postponed recording single purchases, but there was evidence that she believed that these practices were acceptable to her employer; her supervisor knew of them and, at times, participated in them. Respondent's use of these practices might appear to be motivated by a desire to help customers efficiently —a goal which favored her employer's interest. Consequently, the trial court might reasonably regard respondent's conduct as a good faith error in judgment rather than as misconduct."